Good morning everyone. Good morning, Judge Hamilton. Good morning. Okay, so we're ready for oral argument today. Our first case of the day, appeal number 25-2349 and 2350. Mr. Clement, whenever you're ready. Good morning, your honors, and may it please the court. Paul Clement for appellant Anne Pramaggiore. I'm going to endeavor to save three minutes for rebuttal before handing it over to my co-counsel. Your honors, both practical and doctrinal considerations. Can I start with a question? I understand the Yates issue 100%. Can you help me understand the difference between a legal error and an evidentiary error? In other words, in a legal error, Yates says, you know, in this case the government, the jury could have considered the 666 charges and stopped right there and we have, I mean, Barreo says that, right? We have no idea what the jury did and what they convict on. We have an evidentiary error. If illegal or invalid evidence is admitted, we consider the case and whether the jury could have convicted despite that bad evidence. But it seems like with legal theories we do not. So I think that's correct and I think that's particularly true when you're talking about what we could call a Yates or a Skilling error. And I think that still means there are cases where you would have harmless error nonetheless, even though there was a legal error. And like a good example of that is a case like Sorich where there's one fraud count and the jury was told that it could go off on either honest services fraud or pecuniary fraud. But if you look at the honest services fraud, it actually involved pecuniary fraud, so this court was able to find beyond a reasonable doubt that it was harmless error. And similarly in the Out of Circuit Jefferson case, if you have convictions on the substantive counts and no Pinkerton instruction, then you might be able to find that the error was harmless beyond a reasonable doubt. But what makes this case crystal clear in my view is the combination of a general verdict on the conspiracy count with concededly flawed counts on 666, combined with the Pinkerton instruction, I just think there's no way you can find harmless error beyond a reasonable doubt on this record, full stop. Now then I think on top of that you have lots of supporting factors that make it clear that even if you want to sort of look beyond that, that this is a case where you couldn't say that beyond a harmless, beyond a reasonable doubt. One, you have just the way this case was tried. I mean, everybody I think acknowledges that the 666 counts were the dog and the books and records counts were the tail. I also think that, you know, the jury note at the 11th hour asking about the Pinkerton instruction and in conjunction with the books and records count, I think also fortifies the conclusion that there's just no way that you can rule out the reasonable possibility that what happened here is the jury looked at the conspiracy count, found the 666 object, called it a day on the conspiracy count, and then applied Pinkerton on everything else, on the books and records counts. And don't take my word for it, that's what Judge Leinenweber acknowledged pre-Snyder when he was asking whether there was sufficient evidence in the record to convict my client on the books and records count. One of the things he relied on is he said a reasonable jury could have relied on the combination of the conspiracy count and the Pinkerton to get the conviction on the books and records count. Well, I mean, even if there's no question, even if the jury doesn't ask a question on Pinkerton, there's still a Pinkerton issue. I mean, this is the danger when you ask for a Pinkerton instruction, right? You take the risk. Absolutely. That's why some prosecutors just don't ask for Pinkerton instructions. They can get them, they just don't want them. Absolutely, Your Honor, and this is a classic case where the government got exactly what it wanted over the objections of the defendants. So the government wanted a general verdict on the conspiracy objects, and the defendants objected and said, no, we want a specific verdict on the conspiracy counts, and the government wanted a Pinkerton instruction, and we objected, and the government got exactly what it wanted. That made it easier for them to prove their case at trial, but Snyder happens, Thompson happens, and all of the sudden, what was good for the government in easing their burden at the trial level now makes it, with all due respect, I think impossible for them to carry their burden of showing that the errors were harmless beyond a reasonable doubt. So in a sense, like I said, they got what they asked for. That was good news for them in a pre-Snyder, pre-Thompson trial evidentiary presentation world, but after those developments, after those intervening developments, and I want to talk about Thompson before I sit down, but there's no dispute that Snyder's a game-changer and knocks out the 666 counts and the 666 objects of the conspiracy. So under those circumstances, what the government asked for, I think now is essentially an albatross that prevents them from being able to show a harmless error beyond a reasonable doubt. But if we reverse, doesn't the government get to try the case again? So yes, if you reverse on my lead argument here today, but of course if you do that, I really would hope that you would reconsider the bail determination, because right now, my client is sitting in prison. I know that. I'm aware of that. Okay, so that's why I wanted to start with the new trial. I mean, I'd love to persuade you that there's no substantial evidence on this record after Thompson, but I will concede that is a both harder argument and a longer argument, which is why I started with the new trial argument, particularly given where my client sits today. But even if there's, even if you win on the falsity issue, the government would still have an opportunity to prove a quid pro quo, I think, at a second trial. Oh, yes. Actually, I agree with that. I agree with that. So there's no question the government's going to get their chance to try to prove their case in a post-Snyder world if they decide it's worth it at this point after people have already served time. That'll be their judgment. I had thought the government dismissed the 666 counts. Is that not correct? Are those available for retrial? I thought that the substantive counts might be available to them. Certainly, the conspiracy count might be available to them. Yes. But, you know, they can sort of address that. Under the umbrella of the conspiracy trial. Yeah, exactly. Okay. All right. Exactly. Okay, thank you. In Sorich, we, and Turner, we focused a lot on the fact that the theory of prosecution would be coextensive for the multiple objects of the conspiracy. You got four here, right? The first two, I think everyone's conceding that the government can't win on. Right. The second two, there's a way they're coextensive, right? One and two and three and four could be coextensive, but only if you are going through pre-Snyder case law. So, to the extent here that the only viable path to prosecution is that three and four are not coextensive with one and two, does that answer the question, or do I then have to look at some language we've had about should a jury, should any jury have convicted on the evidence for the books and records? So, I don't think you need to answer that second question. I think if you do, the answer here is overwhelmingly clear, especially given the way this was tried, given the jury note and all of the rest. But I don't think you even need to go to that additional step. And I would quibble a little bit with the use of language because I think, the way I would sort of say it is the counts here may have been related, but I don't think they were ever coextensive. I think coextensive is a term of art, if you will, that really means there's sort of no gap that would allow a reviewing court to doubt whether the jury actually convicted. And I think you had that in Sorich and you had it in Turner. I think Black's worth a read because Black separated the two fraud counts out. And as to one of them, Judge Posner writing for the court said, there's a gap. And it may be likely that jury would have convicted, but we can't get that from this record. On the second count of fraud, the court thought they were truly coextensive. But I don't think as to the counts here, they really were ever coextensive. I think they were related. And indeed, I think they're so closely related that it's kind of artificial not to have a new trial on the books and records counts post Snyder, even if you were to think that Thompson didn't move the sort of chains at all. But before I sit down, let me say just one word on that. I mean, I do think it's very hard in the wake of Thompson to say that falsify means not only make false, but to make misleading. And I think a lot of the indicators that were present in Thompson related statutory provisions that say false or misleading. I actually think the only way to kind of make sense of this statute and separate out what it's the difference between falsifying a record and circumventing a internal accounting control, the latter seems to me to be just a species of making your records misleading. And so I think a world where falsify means what Thompson suggests it would mean, which is really make false and circumvent accounting controls is just a particular form of making your records misleading. Then I think the statute works together as a coherent whole. But I think if you just say falsify can mean make misleading, it doesn't work together. If it's I know you, I know you want to sit down and get to rebuttal time for rebuttal with my colleagues indulgence. I've got a rather lengthy question about Thompson. I'd like to close to Thompson makes pretty clear that context matters in determining falsity. And that's why the court, as I understood it, did not direct outright acquittal in Thompson, but remanded to this court to reconsider whether the falsity finding should stand. Context here seems to me has at least three key elements. One is that 78 M B two requires the issuer to keep records, books and accounts that quote in reasonable detail, accurately and clearly reflect the transactions and dispositions of the assets of the issue. Those are the records we're talking about. That's the standard they're supposed to meet. Second part is we know that it is a key part of the foreign corrupt practices act to require those records and to require the internal controls and compliance with them. Third, we've got here at least the evidence considered in light most favorable to the burdens, a long term flow of corrupt gratuities to reward Madigan for official acts on a massive scale. 1.4 million, as I understand it, in the payments to the contractors. And we've got a lot of records that at the very least concealed that scheme by omission. Um, in that context, could a jury reasonably find or why could a jury not reasonably find that those not records were falsified in that context? So Judge Hamilton, I'm going to answer that. I'm going to start with the assumption that the way you've asked it, it's really a sufficiency question and not a new trial question. And so I will, I will do my best and I will concede the context matters. And I think the context mattering is part of the reason why it's so obvious there needs to be a new trial, because I think there's a particular problem for the government showing falsity through omissions. And that's what I take this case to be. And I guess my best answer to why, even on this record, it's on sufficiency, they fail is because this really is an omission case and it's an omission case without any duty to disclose. And Judge Leinenweber was actually quite clear that there was copious evidence here that there was no obligation to disclose subcontractors. And that seems to be the nub of what the government suggested was misleading to not disclose. And then the only other thing that... The law imposes an obligation to accurately and fairly reflect the transactions in reasonable detail, right? And if you're, if you're paying somebody 10% of the fee for legitimate lobbying services and 90% to reward Speaker Madigan's friends for doing political work for him, that would seem pretty material to me. Well, I guess that sort of gets to the question, because I do think you're right, that there's a materiality built into the standard. It's in reasonable detail. And I just don't think in the context of a several billion dollar company disclosing subcontractors who, by my math, are getting paid about $150,000 a year, I don't think that's material, which is why I don't think it was a problem. Does it become material if it helps change the law in a way that makes hundreds of millions? Well, I mean, it might be material if you think about it from sort of that perspective. But I guess that's the other thing I'd say before I sit down, which is, I think it's a problem to build in the idea, as you did, Judge Hamilton, I think it's a problem to build in the idea of kind of corrupt gratuities. Because I think the reason that the federal government couldn't persuade the Supreme Court and Snyder is precisely because they couldn't convince the court that the idea of corrupt gratuities had any limiting principle, any purchase, you couldn't distinguish, you know, sort of Cheesecake Factory from the Inn at Little Washington and all of that. So I think importing that back in is problematic. But maybe I'll finish on this point, which is to say, it's particularly problematic, at least not to give a new trial. Because if the government had any hope of showing that these omissions were false in context, the context would be that they were to cover up an unlawful scheme. And, you know, that's presumably what the jury was persuaded by here. And given that the unlawful scheme was invalid as a matter of laws, the government concedes, I think, at a minimum, we need a new trial. Thank you, Your Honors. Thank you, Mr. Quint. Okay, Mr. Bertocchi, we'll hear from you. Good morning, Your Honor. May it please the Court, I'm Joel Bertocchi, and I represent Mike McClain. I want to start off by saying what he said. I thought I'd just make sure that endorsement was clear. And then I want to start, a place I wasn't planning to start, I want to start with Judge Hamilton's question about context and the extent to which the statute plays a role in setting that context. That talks about general duties. But ultimately, what a defendant who has to be proved guilty knowingly and willfully is going to judge is the context of the way the forms are submitted, the way the records are created. Now, of course, Mr. McClain didn't work there. The defendants, both these defendants, one was way up there, my guy was way out there. But you cannot ignore the fact that the witnesses from ComEd all testified, we don't want subcontractors. Kerry Bork testified, the form's not about subcontractors. Somebody named DeRay, Eric DeRay, I think his name, said, I told a consultant, put it all down as your work and don't tell us about the subcontractors. So the government's cooperator said... We're talking, that seems to then create the roadmap, right? This is the roadmap for corruption. Your Honor, the Supreme Court says you've got to go with the statutes that Congress has passed. And I'm not able to comment on whether it's a roadmap. What I'm commenting on is defendants who have to be proved guilty knowingly and willfully are going to judge context by what they see. The statute plays a role, for sure. But nobody who... You can't make a false records count out of the omission of information that was neither asked for nor expected. It doesn't matter... The statutory requirements that Judge Hamilton read off are more specific than maybe 1014, but they're not so specific to say you've got to put subcontractors in there. And if ComEd doesn't... ComEd thinks its books and records are accurate because without listing subcontractors, which the ComEd employees said, and the ComEd employees told people who were filling out these forms, then no defendant in this case or in any case who's submitting those forms is going to question their judgment. Nobody's going to say, no, I got to put subcontractors because 78, whatever it is, says that. Mr. Bertocchi? Yes, sir. Would you agree that there was evidence from which the jury could conclude that the defendants were actively trying to conceal these arrangements for the benefit of Mr. Madigan? I would concede that there was evidence from which a jury could conclude that, but it's not just that. It can't just be that. Your Honor, wait, let me take that. I'm not saying... Mr. Bertocchi, I'm not suggesting that secrecy is sufficient to certainly an important part of the evidence here. Your Honor, as I say it, I'm not really actually going to concede that. And here's why. And again, it's these witnesses. It's Doherty's contract. We've all, as lawyers, read lots of contracts. How many contracts have you read that had the word sole discretion? The people who dealt with ComEd dealt with ComEd on the terms that ComEd set. ComEd said, I don't want subcontractors. ComEd said, you have the sole discretion to hire anybody you want. And ComEd probably doesn't do that all the time. ComEd doesn't buy wire that way. But that's the way... Those are the rules that ComEd, the issuer, set so that it could comply with the record statute. Was there concealment? I don't think you can find concealment, Judge Hamilton, if that's what the person you're submitting the forms to is telling you. And of course, I would be remiss if I didn't mention that Mr. McClain never saw the forms, was not a ComEd employee, had no training in the code of conduct, that all of a sudden has become the central document in this case. Your Honor, at some point, you have to hold the government to the case that it tried. I understand why they tried the case on bribery the way they did, given the condition of the law at the time, but the law changed. I understand why they thought omissions would... It changed in the Supreme Court. I mean, there was a circuit split when the government charged this case under 666. Yeah, and sure, they could have done the cautious thing if they thought they could prove quid pro quo. Maybe they didn't think... Well, they could have charged this as mail fraud, wire fraud. I mean, there's a lot of evidence here. There's a lot of evidence here, okay? Back in my day, we used to love the Hobbs Act. I don't know where it... I don't know where that went, but they chose this, and I don't. They chose this theory, and the theory fell apart, and then they chose to make a false records claim based on omissions, and that theory fell apart. Things change, but the case they tried did not, and the government's got to be held to that. Mr. Bertocchi, do you have issue with the judge's jury instructions on the falsify issue? No, Your Honor. We haven't raised any. I think we have issues with the evidence being insufficient on that, and I think that... But our real issue in terms of the false records... I think the evidence being insufficient is a different issue than the Yates issue, right? Yes, it is. I think the Pinkerton instruction perhaps creates a Yates issue with respect to the FCPA counts. The sufficiency of the evidence issue, though, is different because we're just considering evidence, and that's why I asked about the jury instructions because it seemed to me that the jury instructions include this false requirement. In other words, if we were just considering the evidence... No, you're right. You're right. The jury instructions do, but the evidence was... The evidence didn't prove falsity. The evidence proved an omission. But under, I think, our case law, that's something that we can evaluate. We can evaluate was there sufficient evidence for the jury to convict based on whether or not the records were actually false as opposed... Under Thompson, we can do that. You've got to evaluate the question of what actually false means under Thompson to do that. That's the issue. But that's what I'm not sure of because of the jury instructions. I think Griffin deals with that the way I see it. Griffin deals with that issue and says, that's something we're equipped to do. What we're not equipped to do is decide whether or not the jury convicted on a illegal theory. Right. Well, I think in this case, there isn't any evidence. The way the evidence is about what was in the forms and what was expected of them, the context, which is important under Thompson, makes it impossible to determine, even with those instructions, that the kind of falsity the Supreme Court says has to be there is there when you omit information that no one's asking for and that, in fact, people don't really want. So I think that we haven't made a challenge to the jury instructions, but I think even under those instructions, that issue is there. If the case were to be retried, the judge might have a real challenge formulating post-Thompson jury instructions on that, I suspect. Can I ask you, were you satisfied, were you satisfied, well, did you preserve any objections to the instructions given by the judge about the role of the code of conduct on these books and records counts? Your Honor, I can't answer that question. I don't know. I haven't looked at it because the code of conduct was not what the trial was about. Okay, and one last question, if I may, and that is about whether the government referred to the Fifth Circuit's decision in U.S. against Ryan as a post-Thompson example of false in context, and I was wondering if you had any comment on that case. Your Honor, I don't. Okay, thanks. Okay, sorry. Okay, thank you, Mr. Robacki. Okay, Ms. Sullivan. Good morning. May it please the Court, Irene Sullivan on behalf of the United States. We can be sure beyond a reasonable doubt that any instructional error as to the bribery objects of the conspiracy count did not impact the jury's verdict. How so? I mean, here's the problem. When you charge the case and try the case as a bribery case, what's to say the jury just didn't consider the illegal bribery object of the conspiracy and stop right there and never even discussed? I mean, that is, I think, the classic Yates-Skilling problem. Borreo says it. We don't know, and I don't think we can conduct a sufficiency of the evidence challenge or, you know, test under Borreo, under Yates, under Skilling. How do we get there? I think on the facts of this case, Your Honor, the evidence at trial showed that defendants were primary players and integral to the conspiracy. I don't think, I don't, I think, I think you're right, okay, but talk about the Sixth Amendment to the U.S. Constitution. That's what I'm focused on. In addition, Your Honor, despite the evidence, which I think shows that no jury could have found or would have found based on the evidence that defendants did not participate in this conspiracy. But isn't that just a sufficiency of the evidence, you know, question? I mean, isn't that just a, in other words, you're telling us there's sufficient evidence that if the jury would have considered this theory, they would have convicted. And you might be right, okay? I'm not disputing that. You, there was a lot of evidence presented in this case. You might be right. But I think Yates tells us we have to know. And what I mean by that is, let's say the jury convicted on, let's say one object of the conspiracy had four elements, and one object of the conspiracy had three elements, and the defendants were challenging the object of the conspiracy with three elements. And we know, we would know that the jury convicted, if they convicted on, if they said the problem is with the three elements, does that make sense? We would know that they, we would know. Yes, Your Honor. And it's certainly, we agree that it is not a sufficiency standard, but I don't think that the quantity and the nature of the evidence is relevant to the analysis as the district court found any. But then how do we know? How do we even know they considered these FCPA theories? And by the way, I think despite the jury question, with the Thompson issue, don't you have a Yates problem with the Pinkerton instruction? Well, Your Honor, the second point is that this case is distinguishable from some others because defendants did find, or the jury did find that defendants were guilty on multiple substantive FCPA counts. And I don't think that the Pinkerton instruction compromised the jury's verdict here. But wait a minute, you asked for it. This is what I have trouble with. You asked for it. Now you come up to the United States Court of Appeals and say, pretend like we didn't. It doesn't matter that we asked for it. It doesn't matter. Pinkerton is a dangerous theory to proceed on because it is extraordinarily broad. And you can't come up here and say, let's act as if we didn't ask for it. Well, Your Honor, and as the government said below, certainly we're not pretending that there wasn't a Pinkerton instruction or that they couldn't have found them on the basis of a Pinkerton instruction. But I think it's also important to keep in mind that there were other defendants in this case who are not sitting at this table today. And I'd like to turn to the jury note that opposing counsel raised. The jury note, we just don't know whether they did apply Pinkerton. Isn't that the problem for you? I mean, I agree with you. I think the jury note is irrelevant, totally irrelevant, because we don't know. The jury makes it more likely, but who cares? Because that's not the test. No, and you're exactly right, Your Honor, that the jury note here, we don't know if they applied it. We don't know. It could have been two other co-defendants, one of whom, John Hooker, left the company in 2012. But these defendants... They may not have understood the Pinkerton instruction, by the way. I apologize. They may not have understood the Pinkerton instruction. Well, and as Judge Leiber instructed, he responded to their question to tell them to read the instructions. So we can be sure of that much anyways, that they likely read the instructions. I'd like to turn to defendant's point about this case's relationship with the bribery objects. Even though the district court vacated defendant's bribery convictions, their motive to falsify the records remained the same here, to hide the no-work subcontractors and the relationship between those payments in Madigan. And I'd like to be clear that this is true even if the payments did not meet the elements of Section 666 bribery as set out in Snyder. And that's because the records falsely stated the payments were solely for professional expertise and services rendered, when that just wasn't true. The presumption is that those would have been services rendered for the benefit of Commonwealth Medicine, correct? That is correct. Not for the benefit of Speaker Madigan? Correct, Your Honor. It would have been for the benefit in the form of legitimate lobbying services, not for the benefit of obtaining some futures. Yeah. Could I ask you, Ms. Sullivan, to focus in on the Thompson issue and your best evidence of literal falsity on the substantive FCPA counts, on the sufficiency of the evidence challenged there? Yes, Your Honor. And by that question, you mean what evidence do I have that shows that the documents were, in fact, false under Thompson? False. Yeah. The Thompson standard is going to lie, given the statutory language here. The attempts to distinguish Thompson based on the statutes are not compelling to me. But how do you show falsity to meet the Thompson standard here? Your Honor, the books and records, they purported that the payments were for entirely for legitimate of the payments that were going for legitimate services, the nature of the services being provided, and the purpose of the payments. And we know that they were false for those reasons. Turning to Thompson, Thompson has no bearing on this case. And even if Thompson did apply, the jury was correctly instructed that they needed to find that a defendant falsified or caused someone else to falsify the books, records, or accounts of Comet or Exelon. The evidence overwhelmingly established and the properly instructed jury correctly found that defendants created and caused the creation of documents stating payments to J. D. Doherty and Associates, J. D. D. A., went out for legitimate services and those services only when those representations were false in context, where Comet's books and records were meant to give an accurate and fair account of what Comet was doing with its money. For example, the 2018 J. D. D. A. contract amendment came with a $5,000 price increase due to J. D. D. A.'s expanded role with the Cook County Board President's Office and Cook County Commissioners and Department Heads when that was false. The increase was a payment to Michael Madigan's crony Alderman Zalewski, who did no work, let alone any work, involving Cook County. I'd also like to turn to... Counsel, can we go back to the Yates era briefly? Yes, Your Honor. I understand your argument that the, you know, we have the four objects of the conspiracy and if I understand what you said earlier, well, you know, the third and fourth object don't just fall away because regardless of some changes in case law, people still might want to hide what they think might have been illegal at the time. But, kind of going to what Judge Kirsch was saying, you know, the first object is corruptly soliciting things of value in violation of 666. How do we know that the jury didn't just say, well, we agree with that. We don't need to go on. That's it. That's what a lot of the case was about. We don't need to go to two, three, and four. Now, you know, we're sitting here, we've reviewed things, got a bunch of lawyers. Of course, we go on to two, three, and four, because we have all sorts of alternative reasoning and stuff, but why should we think the jury did that? Sure. So, as I stated previously, I do think the fact that they found for these defendants on substantive counts means something here, and for the scenario the defendants are describing to play out, as you said, with the Pinkerton issue, the jury would have had to have found that a defendant, other than these two, falsified a booking record. But meanwhile, they would also have defined that these two defendants only agreed to commit bribery, and that result just doesn't make any sense. The evidence at trial showed defendants knew that they were funneling payments to Madigan Cronies through no-show subcontractor visions, and that falsifying comments, books, and records, and circumventing the company's internal controls was critical to hiding the true nature and purpose of the payments. These defendants were key players in that scheme. Promagori signed and approved many of the false records herself. McLean devised the plan to use the hidden subcontractor arrangement for no-show jobs, and based on his own experience as a lobbyist and contractor for ComEd, knew that it would generate false contracts, invoices, and resulting entries in ComEd's general ledger. What's the best evidence of that inference of knowledge, would you say? Your Honor. For McLean's part. For McLean's knowledge, sure. First, Mr. McLean, the jury, there's a couple strong pieces of evidence here. The jury heard him say in a recorded call that the work certain consultants did amounted to mere pieces of paper, meaning that they did no work. That's Government Exhibit 77. The jury also heard him advise Marquez, Fidel Marquez, who was the former vice president of legislative affairs for ComEd, later became a government cooperator, not to put anything in writing about the subcontractors, because in McLean's words, all that can do is hurt you. And he, Mr. McLean was a sophisticated actor. He was a lobbyist for a major corporation like ComEd for decades. He personally submitted invoices to ComEd for his own lobbying work to receive payment, and he therefore knew that the forms and the paperwork that was generated as a result of this scheme would have to contain false information that would create false books and records and entries in the general ledgers of ComEd. Could you address Mr. Clement's challenge to articulate why these payments were corrupt, whether they were quid pro quos or not? Your Honor, there, as the district court found under, in its Rule 29 motion following Snyder, there was sufficient evidence of quid pro quo bribery. And Judge Shaw also remarked that although the government certainly did below try to keep that concept, quid pro quo, out of the instructions based on binding Seventh Circuit precedent at the time, the jury did not know that. There was, while there may also have been evidence of gratuities, there was certainly ample evidence here that there was quid pro quo bribery as defined under Snyder. Can I follow up on that? The substantive 666 counts, counts 2, 5, 6, and 8, Judge Shaw dismissed those counts, I think, and the government didn't appeal. So if we remand for a new trial, are those counts out forever? I believe that's correct, Your Honor. I believe that the government did dismiss those counts at 2, 5, 6, and 8. So a new trial would be the conspiracy on the substantive SVP accounts. Could you tell us, Ms. Sullivan, about the role of the code of conduct in the records and accounting controls theories in the case? Yes, Your Honor. The code of conduct is, I'd say portions of the code of conduct, are one example of an internal accounting control. As the jury was instructed to find, the code of conduct said that not maintaining accurate books and records and evading accounting controls is against the law. But there were certainly, and it also directed to accurately report all financial information along other mandates, but there was ample evidence of other internal accounting controls that were presented to the jury at trial, such as the submission of invoices before payment, approval of invoices by someone familiar with charges. There were single source justification forms which explained why certain contracts were exempt from the competitive bidding process. And the code of conduct was one of these several pieces that was presented to the jury. Okay, so it's not a complete internal accounting control system, but it is, it does provide knowledge of some of these standards. Yes, Your Honor. And the jury was also instructed that a violation of the code of conduct alone is not sufficient to warrant criminal liability, but they could certainly consider it as other evidence. Let me also ask you about the defendant's statutory argument about knowledge of the rule in question being necessary for a prison sentence. Is that a finding, I basically just have a procedural and apprendi question, it hasn't been briefed in this way. How was that determination made in this case? The, if I'm understanding your question correctly, Your Honor, I think the burden is on the defendants to prove by a premonitance that they had no knowledge of the regulation. And the intent of that is that someone is not, there's not some innocent person who's... Right, was that question submitted to the jury in so many words? Yes, Your Honor, because the jury was instructed that they had to find that defendants willfully violated the FCPA, they received an instruction over the government's objection that it had, that their conduct had to, that they had to know that it was in, that it was in violation of the law. So for that reason, the question was presented to the jury. So it was proven beyond a reasonable doubt? Yes, yes, Your Honor. Okay. Appellants brought up release. If we were to not accept all of their arguments and reverse and remand for a new trial, would you agree that release is appropriate? I don't think they were detained pending trial. This isn't an F1 case under the bail to form act. Your Honor, I would have to, we've, there was no argument the defendants posed any danger or any flight risk. We conceded that in their, in response to their bond motion pending appeal in the district court. I'm not sure how that would factor into the analysis about the likelihood of the merits of the success on the appeal. So I would certainly, I would need to check with my office, but we would not be contesting on the basis of dangerousness or flight risk. Thank you. And if there are no further questions, the government asks that this court affirm defendant's convictions and sentences. Okay. Thank you very much, Ms. Sullivan. Mr. Clement, we'll give you some rebuttal. I'll give you three minutes for rebuttal. Thank you very much, Your Honor. So if my client weren't sitting in prison, I would listen to this argument and I would say, I'm going to, I'm in pretty good shape on the new trial stuff, and I'm going to jump right to the sufficiency, but my client is in prison. And so I'm going to say a few words about the new trial and then sort of, you know, I'm happy to file a renewed motion this afternoon or something. But if you're convinced that there needs to be a new trial here, then you should be convinced that my client should not be in prison right now. On the new trial issue. I don't think a new motion is necessary. Thank you, Your Honor. I appreciate that. And what I would say just on the new trial motion, I almost feel like we're entitled to a new trial motion as a matter of law here because of the combination of the general verdict and the Pinkerton instruction. And as a number of Your Honors have pointed out, there's just nothing that stops. We can't say that the jury didn't just go to one of those first two objects of the conspiracy and call it a day. And indeed, I actually think given the way this case was tried, that is the more likely scenario, because it really was focused on 666. And you combine that with Pinkerton, and I just don't think it is possible, literally not possible, to say beyond a reasonable doubt that the jury could not have convicted in a way that relied on the invalid counts of the conspiracy. Is that the test, though, or is the test under the Sixth Amendment that the jury has to make the decision, and we have to know that they made the decision? Because that sounds like a sufficiency test. If we say we don't know or we know beyond a reasonable doubt, that seems like us evaluating the evidence, which I think Yates tells us we can't do when it comes to a legal error. I think you're right about that. And as I say, ultimately, on this record, I think you'd get to the same conclusion either way. But that's what I mean by it's kind of as a matter of law. You just look at this, and the test, the way that it was formulated in Sorich and Turner, which seems to me right, is can you look at the record and say that the jury must have done it, but not must have in the sense that the evidence was overwhelming, but must have in the sense that literally, either because they were coextensive or because you got convictions on the substantive count without a Pinkerton instruction, you can literally say they must have reached that conclusion. But absent that, I think there is a huge Sixth Amendment problem with just kind of speculating and essentially making findings that the jury may well not have made. Now, if you don't agree with me on that, though it sounds like you may, and you've got to more of a is the evidence, can we make a judgment based on the record? I mean, my friend from the government said, as to the jury note, we don't know. Well, that's the whole problem. We don't know. And when the standard is that the government has to show their case here beyond a reasonable doubt, if we don't know, that's a basis for a new trial. And the second thing that came up at one point is, you know, the closest my friend tried to make to an argument about how maybe the jury got there, it was to say, otherwise, it doesn't make sense. Well, with all due respect to the jury system in the Sixth Amendment, that's not the obligation. Like, I've looked at plenty of jury verdicts, and I look at that count and that count, and I say, that doesn't make sense. How could they find on that one and not that one? That can't be the test. And so if the government comes up here and says, we don't know, and the best they can come up with is it doesn't make sense, I think you have to have a new trial. Thank you, Your Honor. All right. Thank you, Mr. Clinton. Mr. Pataki, we'll give you your two minutes. Thank you, Your Honor. I'll try to talk fast, as you all know I can. Just to finish up on the new trial point briefly, the Edwards case is instructive. It uses the word perhaps, and it goes through. There's a paragraph in there after it talks about the AIDS era where it says, perhaps this is what happened. Perhaps this is what happened. Perhaps this is what happened. But we don't know, and the jury has to make that decision. So that's why a new trial is necessary in this case. And the only other thing I would say in terms of Judge Hamilton's questions about context, and this goes to the sufficiency of the evidence on the false statement cases, is whatever the statute says, whatever the code of conduct says, listen to what the witnesses from ComEd said they did and didn't want in their records. Forget about Mike McClain. He wasn't even in the building. He never saw any of these. If Jay Doherty had showed up with his contract that gave him sole discretion and said, here's my contract, here are my bills, and here's my list of subcontractors, they would have told him to take his list of subcontractors and go away, just like that witness Eric Duray did when that consultant Roosevelt group tried to put a subcontractor on there. ComEd, in the end, has got to be its own, even under this statute, its own judge of what it wants and doesn't want. And they made it clear they did not want to know about subcontractors. So you can't make the omission of subcontractors the linchpin of a contract. And some statutes, you have to have a duty, and if you don't fulfill your duty, then you have failed it and you have omitted something that we're supposed to keep going. So if there's a retrial, and the evidence shows, yep, ComEd's saying that we don't want to know about subcontractors. And I'm not saying, this is hypothetical. And the evidence also shows that everyone in the conspiracy knows, I don't want to know about the subcontractors the same way I don't want you to say, let's buy cocaine. Is that false? We can see what the retrial does, but it is not in the sense that subcontractors is an issue that goes to something that was in Doherty's contract that gave him the discretion. There's nothing in any of this stuff about, and I understand it's a fanciful example, but you've got to, if somebody had gone to ComEd and said, here's the money I spent on cocaine, it would have set off red flags naturally. But if he'd gone with a list of subcontractors, they would have said, we don't want that. And so that's why in this case, it's not sufficient. If I recall, there was testimony, however, that if they had made clear that the services were being provided not to ComEd, but for the benefit of Speaker Madigan, that would have raised red flags, a la cocaine. Yes, perhaps it would have. But again, that might be a good subject for the retrial, but the case was charged and tried differently. Thank you. Okay. Thank you, Mr. Bertocchi. Thank you, Ms. Sullivan. And thank you, Mr. Clement. The case will be taken under advisement.